Good morning, Your Honors. May it please the Court, Roger Lane for the appellants and plaintiffs below, and with me is my partner Courtney Worcester. If I may, I'd like to reserve three minutes for rebuttal. You may. Your Honors, the threshold question on this appeal is whether the appellant's claim is direct or dual direct and derivative as we submit, or whether the claim is wholly direct, wholly derivative as the District Court found. A secondary... Would you start by giving me a definition or set of criteria that, in your view, would distinguish a derivative claim from a direct claim? Of course, Your Honor. In the parametric sound case, the Supreme Court of Nevada adopted the Thule test from Delaware, which asked two questions. Who suffered the harm, and to whom would the remedy go? And so in a stockholder case such as this, we look at whether the harm was visited on the stockholders individually or some subset of them, or whether the harm is visited on the corporation as a whole in a case. And so in this case, we have the conducted issue falls into two buckets, if you will, doctrinally. The challenge to a cash-out merger, which is a more familiar theory, and the challenge of equity expropriation, as it's now called, which is a much more novel theory. The cash-out merger is the easier case, and I'll address it first, if I may. In Cohen v. Mirage Resorts in 2003, the Nevada Supreme Court made clear that a claim brought by a dissenting shareholder that questions the validity of a merger as a result of wrongful conduct on the part of majority shareholders or directors is properly classified as an individual or direct claim. Therefore, if the complaint alleges damages resulting from an improper merger, it should not be dismissed as a derivative claim. And then in parametric sound in September 2017, the Nevada Supreme Court, as I said, adopted the Delaware Tooley test to distinguish direct from derivative claims, and said that under that test, Cohen was properly decided. And the situation described in Cohen is exactly what we have here, Your Honors. We have a cash-out merger in which the minority, the common holders who included the cash-out, stripped of their shares for virtually no consideration, without their consent. While the controller engineered a quick exit, within 19 months of its investment, a merger agreement had been agreed to. The negotiation started only six months after they made that investment, and in that time period of while the common was left with virtually nothing. That is a classic stockholder direct claim. And unfortunately, the district court, Your Honors, conflated this with the equity expropriation claim. When it said, the appellants do not allege how these actions caused the value of plaintiffs' common shares to shift to cash-out merger with the equity expropriation. And we respectfully submit that needs to be corrected. And for further clarity on direct versus derivative, if it helps the court, the situation here, and as described in Cohen, should be distinguished from the situation actually before the court in parametric sound. In parametric sound, parametric was not a party to a merger. Its stockholders were not cashed out. Its subsidiary merged with a third-party company. The parametric stockholders before and after the merger still held the same number of shares. Their shares had been diluted by the merger, separate issue, but that is not a direct claim. It's not a cash-out merger. And the parametric court so held. So counsel, and one of the things in the case is detailed is the so-called sleep mode. Yes. So let's just, just with that, under your theory, the sleep mode, let's say that was the only allegation in the case. That would be derivative, I take it. That would be a piece of our equity expropriation theory, separate and distinct from the cash-out merger. So what I guess what I'm saying is that if that were the only claim in the case, let's say people were upset that they, that the company wasn't expanding as they did in the past. And that was the only theory in the case. Would that be a derivative claim or direct claim? Your Honor, I want to answer them two parts if I may. Sure. The sleep mode allegation was that, was of two parts. That all public support was taken from the only stock that was publicly traded, which was the common. And so the market, starved of information, discounts the stock. That damages the value of the common shares, but has no impact on Fertree's value. It has no impact on the fundamental value of the company. A lack of information would be the same for a stock as a bad rumor. The company's rumored to have done something improper. The stock temporarily drops. But there is no impact on the fundamental value of the company, its assets, its cash flows, which is what I tried to convey below. So it's possible if you just stop there, the stock could recover. But it isn't derivative because the company hasn't been damaged. But it seems to me that, I mean, Thule talks about mismanagement claims. It says mismanagement claims are derivative. Yes. If a company is not expanding as fast as someone says it should expand, wouldn't that be a mismanagement claim? In this context, Your Honor, we say it is not. A classic mismanagement claim is a breach of the duty of care when disinterested, unconflicted, independent directors just don't do their job. They neglect doing their job and they're charged with a breach of the duty of care. That's a classic mismanagement claim. I should add the directors are typically shielded from liability for that by the charter. What we allege here, and I may be going beyond your question, but I just want to make it clear. Please. What we allege here is that putting the company in sleep mode and devaluing the common was part and parcel of a further conflicted course of conduct. To issue shares rather than cash to pay dividends so that you get dividends upon dividends and liquidation preference upon liquidation preference instead of payment of a charter amendment which has to authorize hundreds of millions of shares because the anti-dilution provision is key to the price of the common stock which you've artificially devalued. That in its totality is our equity expropriation claim. We acknowledge it's novel. It wasn't even acknowledged as a claim in Nevada until Parametric Sound which had not been decided when we were in court. That's how recently it has been validated. And we now have a decision on remand from the District Court in Nevada and Parametric upholding the equity expropriation claim. And so the court can look to that too if that helps in providing guidance. But to your point, Your Honor, we say that the cash out merger has to be analyzed as such. It has its own set of rules and principles. We allege a conflict of interest. And I should add, because this may come up, in challenging a merger, Nevada law says that the question is whether the merger was accomplished through fraud or the unlawful conduct of individuals controlling the corporation. And what's critical here, and this is in Parametric Parametric citing Cohen, is that the term fraudulent in this context, in the encompassing the breach of an officer's, director's, or majority shareholder's fiduciary duties. And here we allege that Furtree was on both sides of all these decisions. It has a conflicted board that it controls. At minimum, it's two executives and, pardon me, a CEO who depends on them for his livelihood. And then Barber and Margent get large grants incenting them to sell the company. And then Furtree, as the controlling stockholder, is on both sides, the recipient of the benefits of the merger. And it's the same with the equity expropriation, where the board and Furtree engineer this process. Dividends are provided for in the Furtree financing agreement, as the appellees note, but it's not self-executing. The directors have to declare a dividend and further decide what form of consideration to pay. In this case, the appellees actually provided you the certificate of designations. Dividends are supposed to be paid in cash. They elected to pay them in preferred stock. And that, for an equity expropriation theory, is the excess value element that the district court didn't think we had. And then for the Charter Amendment, the depressed common price. And then you unilaterally amend the Charter without the consent of other holders to authorize this massive additional number of preferred and common shares. And that, that's the theory. Again, we acknowledge it's novel. And I welcome any questions you may have, but that's, those are the two sides of the case. Any questions, Your Honor? None that I can put into words at the moment. It's complex, and I admit that. I've been doing it for 30 years, and I'd be bored if it weren't. But I thank you for the time, and I'll reserve the balance if that's acceptable. It certainly is. Thank you. We'll hear from appellees. Good morning, and may it please the Court. Sheila Siddigy of Lowenstein Sandler, on behalf of the Pertree, Inc., and defendants Jarrett Cohen and Scott Trohler. And with the Court's permission, defendants have agreed to divide our time so that I'm going to take 11 minutes. Yeah, we have that on the clock. So the question of whether plaintiffs' claims are direct or derivative is a threshold question of standing that is outcome determinative in this case. And the theory that the plaintiffs are trying to apply is not just novel, it just doesn't fit. Well, there are two by saying you can't lump it all together. So there are two theories, and I'm actually glad that Your Honor asked for a set of criteria to determine whether or not these theories actually rise to the question of direct or derivative. Because we're starting with the premise that all of the fiduciary claims that the plaintiffs have asserted are by default derivative in nature. So to fit with these exceptions, the plaintiffs' factual allegations, these claims are able to plead facts that show three things, and that those are three things that have to be shown whether we're talking about a challenge to a stock issuance, which is the equity tunneling claim, or whether it's with respect to a merger. And that is, first, that there's a controlling shareholder that is improperly wielding that control. Second, that the control is being wielded in connection with the transaction that's being challenged. And third, that improper action in connection with the challenged transaction is taken at the expense of the shareholder and not the company. And this is what ties it back to the Tooley notion that the harm has to be something that can be harmed to the shareholder separate and apart from harm to the company. So how does this come about? In cases where, and I agree with Mr. Lane, this is new and it's narrow. It's a very narrow escape hatch to the default rule that these claims are derivative. So where does that come about? Well, in the equity tunneling sense, it comes about where you have someone, for example, Gentile is sort of the quintessential case in Delaware. So there you have an example where you've got a controlling shareholder, it's got three million dollars of debt that's issued to the company, you've got a conversion contract that says, I'm going to be able to convert my debt into equity, and it's going to be able to convert it 50 cents, you know, per share. So basically for each dollar of debt that I'm converting, I'm going to get two shares of equity. And the allegation there is he coerces the board, takes action as controller, and causes the board to completely disregard the contractual conversion claim and cashes in or exchanges 2.2 million dollars of debt for the company, not for the 4.4 million shares, he should have, but for 44 million shares, with no additional consideration. That that then has now taken that value from shareholders that otherwise would have had payment for those shares in a merger, and has expropriated it to that shareholder. So that's an example. That's Gentile v. Rosette. You see the same kind of thing in the Carcenaro case with respect to financings, where the controlling shareholder is dominating the board and causing transactions that are tunneling this value away. On the merger side of things, it's the same thing. You're going to have somebody who's, and I agree now with respect to a merger, you're only going to be able to have a direct claim if you're attacking the validity of the merger. That implicates some kind of fraud, and the cases that have allowed this exception for it to be a direct claim in a cash-out merger have basically said that this happens when you have side deals. So Mr. Lane cited Cohen v. Mirage. Well, yeah, in Cohen v. Mirage, you've got an issue where the acquirer is trying to get a deal to to buy this boardwalk on the strip in Las Vegas. You have controlling shareholders that own separate property, separate and apart from the deal, to acquire the that what's the challenge transaction? It's the negotiation of the merger. That's how you're attacking attacking the validity of the merger process. The allegation was that in connection with the negotiation of the merger, the controlling shareholders used and wielded that position to extract a unique benefit by going and getting side deals. They went to the acquirer and said, you know, basically the allegation was, buy our separate land for overvalued prices, and we'll sort of even it out because we're going to vote in favor of this acquisition of the target company at an undervalued price. Well, that's a unique, not rateable benefit that was only given to the controlling shareholder. So in this case, you have something completely different. And this is something that Judge Due noted because the district court. Well, the fact that it's different doesn't mean that it isn't potentially valid. So I agree with your honor. Just because it's different doesn't mean that it might not fit the theory. But here it doesn't even come close for a couple of different reasons. And one important thing to remember is that, you know, again, whether you're on the equity tunneling theory or whether you're on the attack, the validity of the merger theory, you've got a controlling shareholder that is improperly wielding that control in connection with that challenge transaction to cause the unique harm to the shareholder. Here, what's being alleged is dilution, right? That's the harm. The harm that the plaintiffs are complaining about is the fact that they were out of the money when they were cashed out of the merger. Being out of the money, in this case, is a direct effect of the liquidation waterfall that exists in the financing agreement. And the reason the financing agreement is so important to this case is because this is an agreement that set forth all the terms, every single issuance that could be challenged, stock issuance, or the liquidation waterfall that caused them to be out of the money. These are the things that are complained about. These were provided for in the financing agreement. That is an operation of an agreement. It is not a controlling shareholder exercising discretionary authority to cause something that happened. And the other reason it's important is that financing agreement, and you might want to look at it and say, you know, they say, oh my gosh, you know, Fertree got 200% of its investment back. Well, yes, that's how a capital transaction works. When you are putting 60 million dollars at risk and you have fiduciaries, you negotiate some returns. You're putting money at risk, you're getting some return. The critical issue here is that if you want to characterize the return that they were able to get as a steep return, it wasn't negotiated by a controlling shareholder. That deal was negotiated when Fertree was a total stranger to CIGW. So you don't have a conflicted transaction. You have an outsider, Fertree, negotiating these contractual provisions, and you in fact have plaintiff consenting to them. And that's also a really important issue here because they consented to, approved in all respects as fair, and ratified the financing agreement and all of the related transactions, including the certificate of designation. That's filed with the SEC. That's their letter consenting to it. The certificate of designation for the preferred shares contains the anti-dilution provision. And though this charter was unilaterally amended, because it had to be, because the company didn't have enough shares to satisfy the requirements of the anti-dilution provision, again, these are really important facts in this case because that that they're complaining about happened as a direct result of the fact that the plaintiffs in this case, which is another interesting fact, they voluntarily gave up their superior position in the capital structure as exchange that for a subordinated equity position. They then, and again, this is before Fertree was a shareholder at all, they made an agreement with the company that said these loans are going to convert to equity over time in the future. Okay? At the time that Fertree came in and was an outsider and negotiated the financing agreement that had these equity dilution these anti-dilution protections and the liquidation priorities and waterfall, the plaintiffs knew that their agreements after that were going to convert to all of these shares of equity and they knew that those anti-dilution provisions were going to be triggered. So what they're basically alleging is that the company should have breached the certificate of designation for the preferred shares and this is somehow extra contractual or discretionary. They knew it was going to happen and that happened. And again, with respect to the merger, when you really look at the well-pled allegations of the complaint, what they are complaining about is the allocation of proceeds. Just as at the start of this, where you have Fertree not being a controlling shareholder on the side of the financing agreement negotiation, well now you've got a merger where, and again, going back to what are our three criteria for having an exception to the derivative rule to be direct, you have the controlling shareholder improperly wielding that control. In the cases that allow this, and this is the Cohen case, Parnes v. Bally, and the Delaware court case in Straight Path, you have the controlling shareholder dominating the transaction that's being complained of to expropriate some value. Fertree wasn't on the other side of this transaction. This was a merger to sell the company to an unaffiliated third party. The fact that Fertree got all of the proceeds and that they didn't flow through is only in relation to the waterfall that was in the agreement. And I'll just say one other thing because I see I'm short on time, but counsel talked about the fact that the shares are issued relative to the common stock and devaluing the common stock, you know, allowed these to mushroom. And I think it's very interesting, if you look at their, if you look at their own complaints with respect to the stock issuances, they allege in paragraph 45 of their complaint, and that's at ER 99 in the record, they themselves allege that each of the transactions, and these are the initial transactions that also gave Fertree more shares in exchange for consideration for financing, that it's that liquidation preference that was totally as a result of the financing agreement that they agreed to. Thank you, counsel. Thank you, Your Honor. Ms. Treanor. May it please the Court, Corrine McCann Treanor on behalf of Paul McGinn. I join in the arguments asserted to affirm the district court's order. I limit my argument to the fact that an abetting should be affirmed, even if the court decides that plaintiffs have standing. Assuming arguendo that count two is not dismissed, count three still fails because plaintiffs must plead in a non-conclusory manner, facts demonstrating the director's knowing participation, yet plaintiffs fail to allege such facts. Inaction only amounts to participation if that inaction was consciously intended to assist Fertree breach its duty. An illicit state of mind is required. Plaintiffs chose not to ostensibly respond to our argument that count three should be dismissed, and they have thus waived the point. Their allegations about what the directors did or did not do are never paired with any well-pled facts illustrating that the directors acted with actual knowledge that the conduct allegedly advocated or assisted constitutes a breach. As the Delaware Supreme Court explained in Malpied v. Townsend, when the subject act involves arm's-length negotiations and a resulting transaction, there can be no liability for aiding and abetting. Because plaintiff's complaint is deficient and because plaintiffs concede the point by not responding to it in their reply brief, we respectfully submit that this court should affirm dismissal of count three on these alternative grounds. Thank you. Thank you. May it please the Court, James Siegel on behalf of the independent directors Gabriel Margent and Grant Barber. District Court should be affirmed for the reasons stated in its order, but even if this Court disagrees with the District Court's reasoning, it should affirm the judgment as the individual directors. That is because plaintiffs haven't met their burden of pleading that these directors committed intentional misconduct. So this parallels the argument just advanced by my colleague, but applies to all the claims against the individual directors. The bodice of exculpatory statute protects directors from personal liability unless a plaintiff satisfies three requirements. Number one, rebut the business judgment rule. Number two, plead that the directors breached their fiduciary duties. And then number three, plead that these breaches involve, quote, intentional misconduct, fraud, or a knowing violation of law. Plaintiffs haven't satisfied any of these requirements, but it's especially clear that they haven't satisfied the third. Plaintiffs don't even attempt to argue that they pleaded facts from which it might be concluded that the individual directors engaged in intentional misconduct. Instead, they argue that they need not satisfy this requirement at all, but need only plead fiduciary breaches. This is in footnote eight of their reply brief. Their contention is contradicted by the plain text of the bodice statute, which makes very clear that these are separate and independent requirements. That makes sense because the statute is designed to protect directors and wouldn't accomplish that purpose unless these were, in fact, separate and independent requirements. This court reached that conclusion in the Louisiana Municipal case, which we've cited. There it held that even if the directors had breached their fiduciary duties, they could not be held personally liable because there were no allegations from which it could be concluded that they knowingly did so. Nevada Supreme Court's decision in the Americo case, which we've also cited, is to the same effect. Plaintiffs never even attempt to respond to these controlling authorities. Because this legal issue is so clear, the directors should not be put to the additional time and expense of defending against this litigation that cannot succeed, and that this court can quickly and efficiently resolve in their favor now. The very point of Nevada's expulsory statute is to protect directors from the burdens of such litigation. We therefore ask that even if the court reverses the judgment below in any respect, then it should not, but at least affirm the judgment as to the individual directors. There's no reason for them to remain in the case. Thank you. Thank you, Your Honor. You have some rebuttal time. I would say thank you, Your Honors. Very briefly, just on the last point, on the intentional misconduct point, I had said that in parametric sound, the Nevada Supreme Court said, and I quote, the term fraudulent in this context is a term of art encompassing the breach of an officer's, director's, or a majority shareholder's fiduciary duties. That's what the Nevada Supreme Court says. And that is at 401 Pacific 3rd, 1106. And it is also, quote, citing the prior Cohen case from 2003. So the Nevada Supreme Court has been consistent on this point. And that's a 62 Pacific 3rd at 728, 729. A second and separate point. Respectfully, I believe Attorney Sedighi is conflating the cash out merger analysis with the equity expropriation analysis. There is no requirement to challenge a merger where a controller benefits that there be side deals. And one case I would point you to is the Trados decision from the Delaware Chancery Court, which is cited in our briefs. The allegation is that the controller, with its liquidation preference, has an incentive to sell the company in the near term and realize on that gain, rather than growing it for the long term for the benefit of all Nothing that was done was outside the pre-existing terms of the financing agreement, and thus there was no discretion for the controlling shareholders to exercise. First, Your Honor, I submit that is wholly false as regards to the merger. The financing agreement did not in any way, shape, or form call for a merger at any particular time, or require that the company be sold, liquidated, go public, or any other liquidity event at any particular time. That was a wholly discretionary decision on the part of a board that we allege is conflicted for the benefit of the controller, who could take a quick profit off the table. That can be the incentive for private equity firms. The courts recognize it. And that's the point there. The merger is wholly outside the terms of the financing. It's true the proceeds follow the preference in terms of distribution, but that's not what we're challenging. We're challenging the fact of the merger occurring when it occurred in the short term for the benefit of the controller, knowing it would leave the common holding the bag. That's the claim. As regards the anti-dilution and charter provisions, as I acknowledge, they are included in the financing agreement. My issue is that on not to declare cash dividends as they could have, and instead paid the dividends in preferred stock, which resulted in more liquidation preference and more dividend rights. That wasn't dictated by the financing agreement. As to the charter amendment, the issuance of shares was so high at the time that was done, and the amendment had to be done, because the depressed common price meant that many more shares were needed than were originally anticipated. And so that charter had to be amended basically at the last minute to accommodate the share count. And so that's our point there. Okay. As for the merger, respectfully, Fertree was on both sides on the company in the merger, too, and I wish to make that clear. Attorney Siddiqi pointed out that in the merger, the company was sold to a third-party company. That's true. But Fertree, through its board that it dominated, approved the merger, and then Fertree unilaterally and solely voted it through stockholders without soliciting any votes from a minority. So there was a real lack of protection, procedural process protection, for minority rights in this whole process. And that's kind of the nub of the claim when you cut through it and express it in real-world terms. Thank you, counsel. Thank you, Your Honor. The case just argued is submitted, and the arguments of all counsel have been extremely helpful. Thank you.
judges: Tashima, Graber, Owens